UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MALCOLM LOUIS LEBLANC, ET AL   *          CIVIL ACTION

VERSUS                         *          NO: 05-5485

CHEVRON USA INC., ET AL        *          SECTION: "D"(5)

<u>**ORDER AND REASONS**</u>

Before the court is the **"Motion in Limine to Exclude Reports and Testimony of Dr. Frank Gardner, and Motion for Summary Judgment" (Doc. No. 99)** filed by Defendants, Chevron U.S.A., Inc. (formerly known as Gulf Oil Corporation), Exxon Mobil Corporation, El Paso Energy E.S.T. Company (as trustee for EPEC Oil Liquidating Trust), Shell Oil Company, Mobil Corporation, and Murphy Oil USA, Inc. Plaintiffs, Malcolm Louis LeBlanc, Victoria Richaux LeBlanc, Timothy L. LeBlanc and Heidi M. LeBlanc, oppose the motions.  The motions, set for hearing on Wednesday, April 11, 2006, are before the court on briefs, without oral argument.  Now, having considered the extensive briefing of counsel, the record, and the applicable law, the court finds that the motions should be granted.

## I.  Background

From approximately 1960 to 1991, Plaintiff, Malcolm LeBlanc, was employed by two trucking companies, Younger Transport, Inc. and Matlock Company, Inc., as a driver of tanker trucks allegedly used to transport benzene and products containing high levels of benzene.  Plaintiff allegedly loaded and unloaded his trucks with the benzene and benzene-containing products at Defendants' facilities.

In 2004, at the age of 73, Mr. LeBlanc was allegedly diagnosed with myelofibrosis, a rare disease of the bone marrow and/or blood.[1]  In November 2005, Plaintiffs (Mr. LeBlanc, his wife and children) filed this suit against various alleged manufacturers, distributors, sellers, suppliers or large industrial consumers of benzene or benzene products, alleging that Mr. LeBlanc's exposure to benzene caused him to develop myelofibrosis.

---

[1]     Mr. LeBlanc's more detailed diagnosis is myelofibrosis with myeloid metaplasia (MMM).

One study reports the crude incidence of myelofibrosis is 2/100,000.  (*See* Zoloth Study, attached to Plaintiffs' opposition as Ex. O, at p. 1049).

Dr. Dennis Paustenbach, Defendants' industrial hygiene expert, reported that "Myelofibrosis with myeloid metaplasia (MMM) is a very rare disease, with a population incidence in the U.S. ranging from 0.4 to 1.5 cases per 100,000 persons (Tefferi, 2006)...The confusion surrounding MMM has been long-lived and has been in part due to the inconsistent nomenclature of the disease in the scientific literature." (*See* p. 12 of Dr. Paustenbach's report, attached as Defendants' Ex. D-1).

2

Dr. Frank Gardner is Plaintiffs' key causation expert.[2]  In *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347 (5th Cir. March 19, 2007), the Fifth Circuit explained the two types of causation, general and specific:  "**General causation** is whether a substance is capable of causing a particular injury or condition in the general population, while **specific causation** is whether a substance caused a particular individual's injury."  *Id.* at 351 (citations omitted, emphasis added).

In this case, Dr. Gardner has opined that:

> Over the decades, comments have been made associating with [*sic*] myeloidmetaplasia with myelofibrosis with benzene exposure.  I have tabulated these from the literature.  From the literature in my personal file (Appendix IV), the large number of individual reports over past decades with [*sic*] a causal association with benzene as the etiology of exposure.  I have divided these reports into three groups: namely, 3a-multiple cases from one report; 3b-case reports over the decades relating benzene as the etiology of myelofibrosis; 3c-reference in texts and reviews relating benzene to myelofibrosis to indicate the historical acceptance of benzene toxicity.

---

[2]     Plaintiffs' other expert is **Dr. Ray Rando**, an industrial hygiene expert.  Further, in his supplemental report, Dr. Gardner relies on the calculations of **Dr. Tumulesh Solanky**, to opine that the Arnetz (Exxon study) and Zoloth study (*Commerical Pressman*) were statistically significant. (*See* Dr. Gardner's Supplemental Report, Plaintiffs' Ex. F). Defendants have moved to exclude Dr. Solanky as an untimely designated expert.  In opposition to this motion, Plaintiffs represent that they would not call Dr. Solanky at Trial, but that Dr. Gardner should be allowed to rely on Dr. Solanky's calculations.  However, as the court discusses later in this opinion, the court finds that the Arnetz and Zoloth studies do not constitute reliable scientific evidence supporting a causal relationship between MMM and benzene exposure. Thus, Dr. Solanky's calculations are irrelevant.

. . .

> From the historic literature correlating
> benzene exposure as the causative agent to
> induce myeloid metaplasia with myelofibrosis
> and the chronic exposure pattern in Mr.
> LeBlanc's occupation, I believe with more
> probability than not his illness of myeloid
> metaplasia with myelofibrosis was related to
> his exposure to benzene in the petroleum
> products.[3]

(*See* Plaintiffs' Exhibit A, Dr. Gardner's original report at pp. 5-6).

In their *Daubert* motion, Defendants seek to exclude the reports and testimony of Dr. Gardner.  And in their Motion for Summary Judgment, Defendants argue that without any expert evidence in support of causation, summary judgment should be granted as to all of Plaintiffs' claims against Defendants.

## II.  Legal Analysis

### A.  Dr. Gardner Possesses the Necessary Qualifications

At the outset, the court must examine a witness' qualifications to determine whether he is in fact "qualified as an expert by knowledge, skill, experience, training, or education...." Fed. R. Evid. 702.  Here, having considered Dr. Gardner's curriculum vitae, the court finds that Dr. Gardner is qualified by knowledge, skill, experience, training, or education to give an

---

[3]    Dr. Gardner refers to Plaintiff's disease as "myeloid metaplasia with myelofibrosis" rather than "myelofibrosis with myeloid metaplasia."

4

opinion in this case about the cause of Malcolm LeBlanc's myelofibrosis.

## B.  Is Dr. Gardner's Proposed Testimony Relevant and Reliable?

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court set forth the following non-exhaustive list of factors to assist the court in evaluating the foundation of a given expert's testimony:

> whether the theory or technique the expert employs is generally accepted;
>
> whether the theory has been subjected to peer review and publication;
>
> whether the theory can and has been tested;
>
> whether the known or potential rate of error is acceptable; and
>
> whether there are standards controlling the technique's operation.

*Daubert*, 509 U.S. at 593, 113 S.Ct. 2786; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. March 19, 2007).

Under *Daubert*, evidence must be both "reliable" and "relevant." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. Evidence is **reliable** if "the reasoning or methodology underlying the testimony is scientifically valid." *Id*. at 592-93, 113 S.Ct. at 2786. Evidence is **relevant** if that "reasoning or methodology properly can be applied to the facts at issue." *Id*. at 593, 113 S.Ct. at 2786.

Federal Rule of Evidence 702, amended in response to *Daubert*, provides:

> **Testimony by Experts**
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Under *Daubert* and Federal Rule of Evidence 702, "a district court has broad discretion to determine whether a body of evidence relied upon by an expert is sufficient to support that expert's opinion." *Knight*, 482 F.3d at 354. Further, as the Fifth Circuit instructs:

> in epidemiology hardly any study is ever conclusive, and ... an expert [is not required to] back his or her opinion with published studies that unequivocally support his or her conclusions. Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may "go to the weight, not the admissibility" of the expert's testimony.[4] ... Nonetheless, t h e

---

[4] As the *Knight* court explained:

A contrary requirement "would effectively resurrect a *Frye*-like bright-line standard, not by requiring that

6

> expert's testimony must be reliable at each
> and every step or else it is inadmissible.
> "The reliability analysis applies to all
> aspects of an expert's testimony: the
> methodology, the facts underlying the expert's
> opinion, the link between the facts and the
> conclusion. et alia."

*Id.* at 354-55 (citations omitted, footnote added).[5]

This court recognizes that it has "an important role as gatekeeper[] in determining whether to admit expert testimony, and it "must carefully analyze the studies on which experts rely for their opinions before admitting their testimony." *Id.* at 355. Further, as the Fifth Circuit instructs:

> [e]vidence concerning specific causation in

---

> a methodology be 'generally accepted,' but by
> excluding expert testimony not backed by published
> (and presumably peer-reviewed) studies."

*Knight*, 482 F.3d at 354 (citation omitted).

[5]    In *Knight*, two tankermen who developed two different types of cancer (Hodgkins lymphoma and bladder cancer) allegedly as a result of their on-the-job exposure to various chemicals, including benzene, brought a toxic tort action against their employers.  The Fifth Circuit affirmed the district court's order excluding the proffered testimony of the plaintiffs' causation expert (Dr. Barry Levy, a highly qualified epidemiologist and physician), and reasoned:

> Of the over fifty studies relied upon by Dr. Levy,
> none gave an adequate basis for the opinion that the
> types of chemicals appellants were exposed to can
> cause their particular injuries in the general
> population.  Because the data relied on by Dr. Levy
> failed to provide a "relevant" link with the facts at
> issue, his expert opinion was not based on "good
> grounds."

*Knight*, 482 F.3d at 355 (citation omitted).

7

toxic tort cases is admissible only as a
follow-up to admissible general causation
evidence. Thus, there is a **two-step process**
in examining the admissibility of causation
evidence in toxic tort cases. **First**, the
district court must determine whether there is
general causation. **Second**, if it concludes
that there is general-causation evidence, the
district court must determine whether there is
admissible specific-causation evidence.

*Id.* at 351 (citations omitted and emphasis added).[6]

1.   **First step: whether benzene and the type of**
              **benzene exposures that Malcolm**
              **LeBlanc experienced cause**
              **myelofibrosis in the general**
              **population (general causation)**

*(a) Malcolm LeBlanc's level of exposure to benzene*

The Federal Judicial Center's Reference manual on Scientific

Evidence instructs that:

Critical to a determination of causation is
characterizing exposure. Exposure to a toxic
substance can sometimes be established by a
review of the patient's history and various
available indicators of exposure...There are
four "cardinal" pieces of exposure
information:

1. The material or agent in the

---

[6]    The court reiterates that "[g]eneral causation is whether a
substance is capable of causing a particular injury or condition in the
general population, while specific causation is whether a substance caused a
particular individual's injury." *Knight*, 482 F.3d at 351 (citation omitted).

environmental exposure should be identified.

2. The magnitude or concentration of an exposure should be estimated, including use of clinical inference.

3. The temporal aspects of the exposures should be determined - whether the exposure was short-term and lasted a few minutes, days, weeks, or months, or was long-term and lasted for years. Similarly, the latency between exposure and disease onset is often critical.

4. If possible, the impact on disease onset is often critical.

. . .

In determining causation, the physician may have particular hindsight into clinical clues related to exposure, such as clinical indicators of degree of exposure, temporal relationships, and the effect of removal from the toxic substance. The physician also has particular insight into the role that preexisting illnesses may play in causing an exacerbation, recurrence, or complication of a clinical condition independent of any exposure to toxic products, or in concert with a toxic exposure.

*Reference Manual*, at pp. 472-73.

In this case, Dr. Roy Rando, Plaintiffs' industrial hygiene expert, used Malcolm LeBlanc's description of his work history, a time/activity profile, and estimated benzene exposure levels based on job, task, or activity, to initially estimate Mr. LeBlanc's cumulative lifetime benzene exposure as 17.9 ppm-years. (*See* p. 12

of Dr. Rando's original report, attached to Defendants' original brief as Ex. F). Upon re-valuation, Dr. Rando included the addition of exposure years for dermal exposure and concluded that Mr. LeBlanc's cumulative lifetime benzene exposure as 26.2 ppm-years. (*See* p. 9 of Dr. Rando's supplemental report, attached to Defendants' original brief as Ex. G).

Defendants' industrial hygiene expert, Dr. Dennis Paustenbach, initially estimated Mr. LeBlanc's cumulative lifetime benzene exposure was between 7.8 ppm-years and 15.8 ppm-years. (*See* pp. 12 & 20 of Dr. Paustenbach's initial report, attached to Defendants' original brief as Ex. D-1). In his supplemental report, Dr. Paustenbach estimated Mr. LeBlanc's cumulative lifetime benzene exposure, including possible dermal intake) was no greater than 7.44 ppm-years. (*See* p. 3 of Dr. Paustenbach's supplemental report, attached to Defendants' original brief as Ex. D-2).

The parties (and their experts) agree that there is sufficient scientific evidence showing a causal link between benzene exposure and **acute myelogenous leukemia (AML)**,[7] **which is <u>not</u> Malcolm**

---

[7]     Dr. Paustenbach states in his report that the cumulative benzene exposure below which there is no increased risk of AML is between 50 and 400 ppm-years. (*See* p. 19 of Dr. Paustenbach's initial report, attached to Defendants' original brief as Ex. D-1, citations omitted). Malcolm LeBlanc's cumulative exposure of 26.2 ppm-years (per Dr. Rando) or 7.44 ppm-years (per Dr. Paustenbach) is substantially lower 50-400 ppm-years.

However, Dr. Gardner states in his report that:

Current reports about benzene exposure has (*sic*)

**LeBlanc's diagnosed disease.**   However, the parties (and their experts) disagree that there is sufficient scientific evidence showing a causal link between benzene exposure and **MMM, which <u>is</u> Malcolm LeBlanc's diagnosed disease.**

### <u>(b)  *Epidemiologic evidence and the Hill criteria*</u>

According to the Federal Judicial Center's REFERENCE MANUAL ON SCIENTIFIC EVIDENCE,

> Epidemiology is the field of public health and medicine that studies the incidence, distribution, and etiology of disease in human populations...Judges and juries increasingly are presented with epidemiologic evidence as the basis of an expert's opinion on causation. In the courtroom, epidemiologic research findings are offered to establish or dispute whether exposure to an agent caused a harmful effect or disease.  Epidemiologic evidence identifies agents that are associated with an increased risk of disease in groups of

_____

> demonstrated a marked reduction in benzene solvent exposure to induce mutagenic marrow changes.  In the Australian petroleum Study, the benzene levels to induce AML or small cell lymphoma (CLL) were in the range of 0.2 parts per million (ppm) benzene daily exposure with an average of [4.9] ppm/years for onset of malignancy.  The French utility worker study had a daily benzene exposure of 0.16 ppm, and a total exposure of 16.9 ppm/years for onset of marrow dysfunction.

(*See* Dr. Gardner's Original Report at p. 3; Plaintiffs' orig. opp. memo. at p. 38).

In any event, the court does not reach the issue of specific causation because as the court concludes in this opinion, Dr. Gardner's testimony regarding general causation does withstand scrutiny under *Daubert* and Federal Rule of Evidence 702.

individuals, quantifies the amount of excess disease that is associated with an agent, and provides a profile of the type of individual who is likely to contract a disease after being exposed to an agent. Epidemiology focuses on the questions of general causation (i.e., is the agent capable of causing disease?) rather than that of specific causation (i.e., did it cause disease in a particular individual?)....

However, it should be emphasized that *an association is not equivalent to causation.* [8] An association identified in an epidemiologic study may or may not be causal. Assessing whether an association is causal requires an understanding of the strengths and weaknesses of the study's design and implementation, as well as a judgment about how the study findings fit with other scientific knowledge. It is important to emphasize that most studies have flaws. Some flaws are inevitable given the limits of technology and resources. In evaluating epidemiologic evidence, the key question, then, are the extent to which a study's flaws compromise its findings and whether the effect of the flaws can be assessed and taken into account in making references.

Michael D. Green, et al, "Reference Guide on Epidemiology," Federal Judicial Center 2000, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *Second Edition*, at pp. 335-37 (notations omitted).[9]

---

[8]     "An association between exposure to an agent and disease exists when they occur together more frequently than one would expect by chance. Although a causal relationship is one possible explanation for an observed association between an exposure and a disease, an association does not necessarily mean that there is a cause-effect relationship."  Ref. Man., p. 348.

[9]     Both Plaintiffs and Defendants have cited this REFERENCE MANUAL in their respective briefs.

Further,

> [w]hen epidemiologists evaluate whether a cause-effect relationship exists between an agent and disease, they are using the term causation in a way similar to, but not identical with, the way the familiar "but for," or sine qua non, test is used in law for cause in fact...Epidemiologists use causation to mean that an increase in the incidence of the disease among the exposed subjects would not have occurred had they not been exposed to the agent.  Thus, exposure is a necessary condition for the increase in the incidence of disease among those exposed.

*Id*. at 374.

The factors that guide epidemiologists in making judgments about causation are known as the Hill criteria[10] and they include:

1.   temporal relationship;

2.   strength of the association;

3.   dose-response relationship;

4.   replication of the findings;

5.   biological plausibility (coherence with existing knowledge);

6.   consideration of alternative explanations;

7.   cessation of exposure;

---

[10]     A. Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965)(Hill acknowledged that his factors could only serve to assist in the inferential process: "None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non.*"), *cited in Reference Manual on Scientific Evidence* at p. 376, n. 113.

13

8.   specificity of the association; and

9.   consistency with other knowledge.

*Id*. at p. 375.

However,

> There is no formula or algorithm that can be
> used to assess whether a causal inference is
> appropriate based on these guidelines.  One or
> more factors may be absent even when a true
> causal relationship exists.   Similarly, the
> existence of some factors does not ensure that
> a causal relationship exists.  Drawing causal
> inferences after finding an association and
> considering these factors requires judgment
> and searching analysis, based on biology, of
> why a factor or factors may be absent despite
> a causal relationship, and vice-versa.  While
> the drawing of causal inferences is informed
> by   scientific   expertise,   it   is   not   a
> determination that is made by using scientific
> methodology.

*Id*. at p. 375.

The REFERENCE MANUAL provides the following discussion of each

of the nine Hill criteria:

> A.   *Is There a Temporal Relationship?*
>
> A temporal, or chronological, relationship
> must exist for causation.   If an exposure
> causes disease, the exposure must occur before
> the disease develops.  If the exposure occurs
> after the disease develops, it cannot cause
> the disease.  Although temporal relationship
> is often listed as one of the many factors in
> assessing whether an inference of causation is
> justified, it is a necessary factor.  Without
> exposure before disease, causation cannot
> exist.

14

B.  How Strong Is the Association Between the
Exposure and Disease?[11]

The relative risk is one of the cornerstones
for causal inferences.  Relative risk measures
the strength of the association.  The higher
the relative risk, the greater the  likelihood
that the relationship is causal...The higher
the   relative   risk,   the   stronger   the
association and the lower the chance that the
effect is spurious.  Although lower relative
risks   can   reflect   causality,   the
epidemiologist   will   scrutinize   such
associations more closely because there is a
greater chance that they are the result of
uncontrolled confounding or biases.

C.  Is there a Dose-Response Relationship?

A dose-response relationship means that the
more  intense  the  exposure,  the  greater  the
risk of disease.  Generally, higher exposures
should increase the incidence (or severity) of
disease.  However, some causal agents do not
exhibit a dose-response relationship when, for
example,  there  is  a  threshold  phenomenon
(i.e., an exposure may not cause disease until
the exposure exceeds a certain dose).  Thus, a
dose-response relationship is strong, but not
essential,  evidence  that  the  relationship
between an agent and disease is causal.

D.  Have the Results Been Replicated?

Rarely,  if  ever,  does  a  single  study
conclusively  demonstrate  a  cause-effect
relationship. It is important that a study be
replicated  in  different  populations  and  by
different   investigators   before   a   causal
relationship  is  accepted  by  epidemiologists

---

[11]  "Assuming that an association is determined to be causal, the
strength of the association plays an important role in determining the
specific causal question-whether the agent caused an individual's injury."
REFERENCE MANUAL at p. 376, n. 115.

and other scientists.

The need to replicate research findings
permeates most fields of study. In
epidemiology, research findings often are
replicated in different populations.
Consistency in these findings is an important
factor in making a judgment about causation.
Different studies that examine the same
exposure-disease relationship generally should
yield similar results. While inconsistent
results do not rule out a causal nexus, any
inconsistencies signal a need to explore
whether different results can be reconciled
with causality.

*E. Is the Association Biologically Plausible
(Consistent with Existing Knowledge)?*

Biological plausibility is not an easy
criterion to use and depends upon existing
knowledge about the mechanisms by which the
disease develops. When biological
plausibility exists, it lends credence to an
inference of causality...When an observation
is inconsistent with current biological
knowledge, it should not be discarded, but the
observation should be confirmed before
significance is attached to it. The saliency
of this factor varies depending on the extent
of scientific knowledge about the cellular and
subcellular mechanisms through which the
disease process works. The mechanisms of some
diseases are understood better than the
mechanisms of others.

*F. Have Alternate Explanations Been
Considered?*

[At this juncture the *Reference Manual* refers
to an earlier discussion of biases and
confounding factors, from which the court now
quotes.]

Systematic error or bias can produce an

16

erroneous association in an epidemiological
study.  Bias may arise in the design or
conduct of a study, data collection, or data
analysis...The two main classes of bias are
selection bias (inappropriate selection of
study subjects) and information bias (a flaw
in measuring exposure or disease in the study
groups)....

*1.  Selection bias*

Selection bias refers to the error in an
observed association that is due to the method
of selection of cases and controls (in a case-
control study) or exposed and unexposed
individuals (in a cohort study)....

*2.  Information bias*

Information bias refers to the bias resulting
from inaccurate information about the study
participants regarding either their disease or
exposure status.  In a case-control study,
potential information bias is an important
consideration because the researcher depends
on information from the past to determine
exposure and disease and their temporal
relationship....

There are many sources of information bias
that affect the measure of exposure, including
its intensity and duration.  Exposure to the
agent   can  be  measured  directly  or
indirectly....

For past exposures, epidemiologists often use
indirect means of measuring exposure, such as
interviewing workers and reviewing employment
records...However,  there  may  be  a  wide
variation of exposure within any job, and
these measures may have limited applicability
to a given individual.  If the agent of
interest is a drug, medical or hospital
records  can  be  used  to  determine  past
exposure.  Thus, retrospective occupational or

environmental measurements of exposure are usually less accurate than prospective studies or follow-up studies, especially ones in which a drug or medical intervention is the independent variable being measured.

The route (e.g., inhalation or absorption), duration, and intensity of exposure are important factors is assessing disease causation....

Even when an association exists, researchers must determine whether the exposure causes the disease or whether the exposure and disease are caused by some other confounding factor. A confounding factor is both a risk factor for the disease and a factor associated with the exposure of interest.

*G. What Is the Effect of Ceasing Exposure?*

If an agent is a cause of a disease one would expect that cessation of exposure to that agent ordinarily would reduce the risk of the disease...In may situations, however, relevant data are simply not available regarding the possible effects of ending the exposure. But when such data are available and eliminating exposure reduces the incidence of disease, this factor strongly supports a causal relationship.

*H. Does the Association Exhibit Specificity?*

An association exhibits specificity if the exposure is associated with a single disease or type of disease. [As noted in the *Reference manual*, "[t]his criterion reflects the fact that although an agent causes one disease, it does not necessarily cause other diseases."]

REFERENCE MANUAL, pp. 376-79 (notations omitted).

18

Relying on the opinions of their own experts,[12] Defendants

_____

[12]     Defendants experts include:  **Dr. John Bickers**, a physician board-certified in Internal Medicine and Oncology; **Dr. Dennis Paustenbach**, board-certified in toxicology, industrial hygiene, and safety; and **Dr. Gerard Raabe**, a specialist in epidemiology, statistics, research methods and sociomedical science.

**Dr. Bickers**, Defendants' causation expert, opined in part:

I have conducted an exhaustive search of peer reviewed literature over the past fifteen years and have concluded, as have the vast majority of scientists, that occupational exposure to benzene may be a risk factor for aplastic anemia (AA) and a potential causal agent in acute myelocytic leukemia (AML).  It is also clear that for AML high levels of exposure for prolonged periods of time, typically in an enclosed space such as a factory, are required.  Statistically significant evidence is lacking linking benzene with other leukemia cell types, the lymphomas and multiple myeloma and MMM.

. . .

In summary, I have not found any significant evidence that exposure to benzene may cause MMM and none has been provided by Drs. Gardner and Rando.  It thus seems clear to me that Mr. LeBlanc's MMM could not possibly be related to his employment.

(*See* Defendants' amended supporting memo, Ex. E-1, Bickers Report, at pp. 2 & 5).

**Dr. Paustenbach** opined in part:

Although it is generally accepted among the scientific community that chronic exposure to high levels of benzene is associated with acute myelogenous leukemia (AML), the scientific literature has not shown that exposures to benzene at any level are linked to myelofibrosis with myeloid metaplasia (MMM).

. . .

The evidence linking benzene to myeloproliferative disorders, and more specifically MMM, is anecdotal at best.  Furthermore, the hypotheses that has been generated by case reports of MMM (Rawson, 1941; Askoy in 1975; Hu in 1987; Tondel, 1995) has not been confirmed by the vast majority of epidemiologic studies of workers being exposed to benzene and more generally, petroleum products (Wong et al. 1993; Hayes

19

essentially argue that epidemiological evidence, elevated pursuant to a *reasoned* application of the "Hill criteria," yields the most reliable scientific evidence for purposes of determining a causal relationship.   And Defendants contend that in this case, Dr. Gardner has no such epidemiological evidence.

However, Plaintiffs maintain that "there are at least five studies showing a statistically significant correlation between benzene and myelofibrosis." (*See* Plaintiffs' Sur-Reply Brief at pp. 2-3).   In their Sur-Reply Brief, Plaintiffs specify the five

---

et al. 1997; Rinsky, 1987, 2002).

(*See* Defendants' Orig. supporting memo, Ex. D-1, Paustenbach Report, at pp. 12 & 14).

> **Dr. Raabe** opined in part:
>
> In my opinion the epidemiologic evidence is consistent in that myelofibrosis has not been associated with benzene exposure.  There is no body of epidemiologic literature meeting the Hill criteria to the contrary.

(*See* Defendants' Orig. supporting memo, Ex. C-1, Raabe Report, at p. 7).

The court notes that Plaintiffs have filed a Motion to Exclude Dr. Raabe's testimony because Plaintiffs' argue that his opinion "myelofibrosis has not been associated with benzene exposure" has not been accepted by the scientific and medical community and it is not the product of reliable principles and methods.  (*See* Plaintiffs' Motion to Exclude Dr. Raabe's Testimony, Doc. No. 96).

Plaintiffs support this argument by referring to many of the articles and studies cited by Dr. Gardner that show an "association" or "link" between benzene and myelofibrosis.  However, as discussed herein "association" does not necessarily mean "causation," and the court finds that the references cited by Plaintiffs and Dr. Gardner are insufficiently relevant and/or insufficiently reliable under *Daubert* and Federal Rule of Evidence 702 to support "causation."  Accordingly, the court **DENIES** Plaintiffs' **Motion to Exclude Dr. Raabe's Testimony.**

following studies for their statistical analyses: **(1) the Rushton study;**[13] **(2) the Kaplan study;**[14] **(3) the Tondel study,**[15] **(4) the Zoloth study;**[16] **and (5) the Arnetz study.**[17]   The court next discusses each of these studies and why Plaintiffs' reliance on these studies for general causation is misplaced.

## 1.   Rushton, L. et al, *Epidemiological Survey of Oil Distribution Centres in Britain,* 1983 BRIT JR OF INDUS MED 40:330-339

Plaintiffs submit that this study:

> is a retrospective cohort study[18] that surveyed

---

[13]    Attached to Plaintiffs' original brief as Exhibit J.

[14]    Attached to Plaintiffs' original brief as Exhibit K.

[15]    Attached to Plaintiffs' original brief as Exhibit P.

[16]    Attached to Plaintiffs' original brief as Exhibit O.

[17]    Attached to Plaintiffs' original brief as Exhibit N.

[18]    The Federal Judicial Center's "Reference Manual on Scientific Evidence" explains that:

> In **cohort studies** the researcher identifies two groups of individuals: (1) individuals who have been exposed to a substance that is considered a possible cause of a disease and (2) individuals who have not been exposed...Both groups are followed for a specified length of time, and the proportions of individuals in each group who develop the disease are compared.

Ref. Manual, pp. 340 (emphasis added and notations omitted).

"Cohort studies also are referred to as prospective studies and follow-up studies." *Id.* at n. 17.  Further, "in some studies, there may be

> mortality in 23,358 workers who were exposed to **benzene** while employed at eight oil refineries and 476 petroleum distribution centers in ... Britain between 1950 to 1975. In a subgroup of 8,470 employees, five cases of **myelofibrosis** were observed with 1.81 expected. This resulted in a significant O/E [Observed and expected deaths] of 2.74.

*See* Plaintiffs' Orig. Opp. Memo. at p. 17, noting the Rushton study at p. 335, emphasis added by court; *see also* p. 1 of Appendix IV-A to Dr. Gardner's Original Report.

However, in this study, no measurements to benzene exposure or any other chemical exposure were made, and thus no conclusions about causation from benzene or other chemical exposure were made. Further, follow-up studies on the same cohort did not confirm the findings of increased incidence of myelofibrosis. *See* Rushton, L. 1993, *Further Follow-up of Mortality in a United Kingdom Oil Refinery Cohort*, BR. J. INDUS. MED., 50:561-59, attached as Ex. C to Defendants' Reply Memo.; and Sorahan, et al 2002, *Mortality of United Kingdom Oil Refinery and Petroleum Distribution Workers, 1951-1998*, OCCUP. MED., 52:333-39, attached as Ex. D to Defendants'

---

several groups, each with a different magnitude of exposure to the agent being studies." *Id.* at n. 18.

"Sometimes retrospective cohort studies are conducted, in which the researcher gathers historical data about exposure and disease outcome of the exposed cohort." *Id.* at n. 19.

Reply Memo.[19]

In discussing the Hill criterion addressing "replication of findings, the REFERENCE MANUAL explains:

> *D. Have the Results Been Replicated?*
>
> Rarely, if ever, does a single study conclusively demonstrate a cause-effect relationship. It is important that a study be replicated in different populations and by different investigators before a causal relationship is accepted by epidemiologists and other scientists.
>
> The need to replicate research findings

---

[19] Defendants' causation expert, Dr. Bickers, explained in his report:

> A thorough search of the peer reviewed scientific literature revealed only a single study linking occupational exposure of benzene to MMM. The study by Rushton and Alderson (Br J Indus Med 1983; 40:330-339) was done in the UK in a cohort of oil distribution workers. In a survey of three companies, one company was reported to have had four cases of MMM (P=.04). This appears to have been a classic example of a one in twenty by-chance cluster because it stands alone and has never been duplicated in dozens of comparable studies. The authors appeared to have attached little significance to the finding as no statistical analysis was done and no new cases were reported in two follow up repots on the cohort (Ruston L. Br J Ind Med 1993; 50:561-569) and Sorahan et al (occup Med 2002; 52:333-339).

(*See* Dr. Bickers' Original Report, pp. 2-3).

Further, in the Sorahan study, the authors concluded that: "The only findings that suggested the presence of an occupational cancer hazard were an excess of mesothelioma in oil refinery workers and an excess of leukaemia in petroleum distribution workers, both excesses occurring in long-term follow-up for workers first employed >30 years ago." Sorahan, et al 2002, *Mortality of United Kingdom Oil Refinery and Petroleum Distribution Workers*, 1951-1998, OCCUP. MED., 52:333, attached as Ex. D to Defendants' Reply Memo.

> permeates most fields of study. In
> epidemiology, research findings often are
> replicated in different populations.
> Consistency in these findings is an important
> factor in making a judgment about causation.
> Different studies that examine the same
> exposure-disease relationship generally should
> yield similar results. While inconsistent
> results do not rule out a causal nexus, any
> inconsistencies signal a need to explore
> whether different results can be reconciled
> with causality.

REFERENCE MANUAL at p. 377-78.

Thus, the court concludes that the Rushton study that has not been replicated is of marginal relevancy to Malcolm LeBlanc's claim, and it is unreliable as support for the conclusion that the benzene exposure Plaintiffs allege caused Malcolm LeBlanc's MMM would cause the same particular disease in the general population in similar circumstances. *Knight*, 482 F.3d at 353.

## 2. Kaplan, S., *Update of a Mortality Study of Workers in Petroleum Refineries*, JR OF OCC MED. VOL. 28, 7:514-516 (1986)

Plaintiffs submit that this study:

> is a retrospective cohort study that surveyed
> mortality of 19,991 workers who were exposed
> to **benzene** in gasoline while employed at
> refineries in the United States between 1940
> to 1980. Three deaths from **myelofibrosis** were
> noted with 1.81 expected for a statistically
> significant SMR of 2.01.

*See* Plaintiffs' Orig. Opp. Memo. at pp. 17-18, noting the Kaplan study, emphasis added by court; *see also* p. 1 of Appendix IV-A to Dr. Gardner's Original Report and p. 335 of Kaplan study.

However, no measurements to benzene exposure or any other chemical exposure were made, and thus no conclusions about causation from benzene or other chemical exposure were made. Indeed, while it may be inferred that the workers were exposed to benzene in gasoline, there is no specific mention of benzene exposure in this study. At the conclusion of this study, the author states:

> The 88 observed deaths from neoplasms of lymphatic and hematopoietic tissue are three more than the observed deaths from each of the components (lymphosarcoma and reticulum cell sarcoma, Hodgkin's disease, leukemia, and cancer of other lymphatic tissue) the difference is the three deaths from myelofibrosis, the expected number of deaths was 1.49, which gives a SMR [Standardized Mortality Ratio] for that cause of 201 with a 95% confidence level of 41 to 588.
>
> It would appear that the concern about neoplasms of the lymphatic and hematopoietic system arises primarily from polycythemia vera, and perhaps from myelofibrosis. There is some question as to whether these are really neoplasms, and the Seventh Revision places them both under diseases of the blood and blood-forming organs. **However, the numbers are too small for polycythemia vera and myelofibrosis to warrant further investigation at present.**

Kaplan study at p. 516 (emphasis added).

25

Thus, the court concludes that the Kaplan study is of limited relevancy to Malcolm LeBlanc's claim and it is unreliable as support for the conclusion that the benzene Plaintiffs allege caused Malcolm LeBlanc's MMM would cause the same particular disease in the general population in similar circumstances. *Knight*, 482 F.3d at 353.

**3.   Tondel, M. et al., *Myelofibrosis and Benzene Exposure*, OCCUP MED. COL., Vol. 45, No. 1 51-52 (1995)**

Plaintiffs submit that this study:

> is a case-control study involving a gas station attendant diagnosed with myelofibrosis who pumped gasoline or diesel from 1962-1979. The authors considered the patient's exposure history, the amounts of benzene in gasoline and diesel, literature showing gas station attendants' levels of benzene exposure coming from gasoline and diesel, and epidemiological data in the Swedish cancer registry dealing with workers exposed to benzene. In reviewing the epidemiological data in the Swedish cancer registry, the authors found statistically significant increases of myelofibrosis in certain occupations involving benzene exposure. In concluding the article, the authors stated, **"The fact that petrol station attendants are exposed to benzene, our case report, the earlier reports on the issue, and the findings from the Swedish Cancer Environment register strongly suggests benzene exposure as a risk factor for myelofibrosis."**

*See* Plaintiffs' Orig. Opp. Memo. at p. 20, noting the Tondel study

at pp. 51 & 52, emphasis added by Plaintiffs; *see also* p. 51 of
Tondel study.

The Tondel study was performed in Sweden, and the authors
recognized that:

> Myelofibrosis is a rare disease with an
> incidence of about 15 cases per year in the
> Swedish population of 8.5 million.  A few
> cases of myelofibrosis related to benzene
> exposure have been reported in the medical
> literature.[20]   One case of myelofibrosis
> appeared in a cohort study of benzene-exposed
> chemical workers.[21]   Despite the lack of
> pertinent epidemiological studies, benzene has
> been suggested to cause myelofibrosis.
> Benzene is known to cause blood malignancies
> and is classified by the International Agency
> for Research on Cancer as carcinogenic to
> humans, causing various forms of leukaemia.
> In this case, we present another case of
> myelofibrosis in relation to occupational
> exposure to benzene in petrol along with some
> register-based epidemiological data.

(*See* Tondel study at p. 51).

The court finds that the Tondel study was *a case study limited
to one individual* in Sweden,[22] and it was not a "case-control

---

[20]    The authors cite these cases in footnotes 1-3 of their article.

[21]    The authors cite this case in footnote 4 of their article.

[22]    The Federal Judicial Center's Reference Manual of Scientific
Evidence explains that:

> After characterizing exposure and the nature of the
> patient's disease, the physician expert witness must
> determine if the medical and research literature
> supports a determination of environmental exposure.
> The research literature includes epidemiological and
> toxicology studies.  The physician should be guided by

study"[23] as Plaintiffs assert.  The individual was a 46 year old man

---

the methods set forth in the Reference Guides on
Epidemiology and Toxicology in evaluating this
literature and its relevance to the patient's exposure
and condition.

Physicians also have access to case reports or case
series in the medical literature.  These reports in
medical journals describing clinical events involving
one individual or a few individuals.  They report
unusual or new disease presentations, treatments, or
manifestations, or suspected associations between two
diseases, effects of medication, or external causes of
diseases.  For example, the association between
asbestos and lung cancer was first reported in a 1933
case report, although th first controlled
epidemiological study on the association was not
published until the 1950s.  There are a number of
other instances in which epidemiological studies have
confirmed associations between a specific exposure and
a disease first reported in a case studies (e.g.,
benzene and leukemia; vinyl chloride and hepatic
angiosarcoma), but there are also instances in which
controlled studies have failed to substantially
confirm the initial case reports (e.g., the alleged
connection between coffee and pancreatic and bladder
cancer or the infectious etiology of Hodgkins
disease).

**Case reports lack controls and thus do not provide as
much information as controlled epidemiological studies
do.**  However, case reports are often all that is
available on a particular subject because they do not
require substantial, if any, funding to accomplish,
and human exposure may be rare and difficult to study.
**Causal attribution based on case studies must be
regarded with caution.**  However, such studies may be
carefully considered in light of other information
available, including toxicological data.

(Ref. Manual at pp. 474-75, emphasis added).

[23]    The Federal Judicial Center's Reference Manual of Scientific
Evidence explains that:

In **case-control studies**, the researcher begins with a
group of individuals who have a disease (cases) and
then selects a group of individuals who do not have
the disease (controls).  The researcher then compares
the groups in terms of past exposures.  If a certain
exposure is associated with or caused the disease, a
higher proportion of past exposure among the cases

28

who had worked as a petrol station attendant (and was exposed to petrol fumes when he regularly inspected the petrol level in arriving tanker lorries) and he was diagnosed with myelofibrosis. The authors stated:

> **When observing a single case in relation to a particular exposure, there is considerable doubt as to whether there is a causal connection or not.  Epidemiological studies would be desirable but sufficient numbers of cases are not easily attainable for this relatively rare disease.**  In this respect, the Swedish Cancer Environment Register provides

---

> than among the controls would be expected...
>
> An advantage of the case-control study is that it usually can be completed in less time and less exposure than a cohort study.  Case-control studies are also particularly useful in the study of rare diseases [such as myelofibrosis], because if a cohort study were conducted, an extremely large group would have to be studied in order to observe the development of a sufficient number of cases for analysis.

Ref. Manual at pp. 342-43, emphasis added, notations omitted.

> The difference between **cohort studies** and **case-control studies** is that cohort studies measure and compare the incidence of disease in the exposed and unexposed ("control") groups, while the case-control studies measure and compare the frequency of exposure in the group with the disease (the "cases") and the group without the disease (the "controls")... The critical difference between cohort studies and case-control studies is that cohort studies begin with exposed people and unexposed people, while case-control studies begin with individuals who are selected based on whether they have the disease or do not have the disease and their exposure to the agent in question is measured.  The goal of both types of studies is to determine if there is an association between exposure to an agent and a disease, and the strength (magnitude) of that association.

*Id.* at p. 340.

the possibility of searching for cancer cases in relation to occupational groups and branches of industry. This nationwide register includes all cancer cases from 1971 to 1984 and employment data from the 1970 census. A search in this register showed that, for men, myelofibrosis was increased among motor vehicle drivers (11 cases vs. 4.79 expected, P < 0.05). No increased risk was found for petrol station attendants (0 cases vs. 0.33 expected). However, myelofibrosis was increased in the transport industry: 7 cases vs. 2.51 expected in the railway sector (P < 0.05), 3 cases vs. 0.7 expected in the private car transport sector (not significant), and 6 cases vs. 2.15 expected for other road transport (P < 0.05).

**COMMENTS**

The fact that petrol station attendants are exposed to benzene, our case report, the earlier reports on the issue, and the findings of the Swedish Cancer Environment Register **strongly suggest benzene exposure as a risk factor for myelofibrosis**. With regard to the pathogenesis, myelofibrosis, as well as leukemia, may derive from a multipotent stem cell in the bone marrow. **This suggestion would explain why benzene causes various blood malignancies, including myelofibrosis. A multi-centre study on this rare disease and benzene exposure seems warranted.**

(*See* Tondel study at pp. 51-52, emphasis added).[24]

_____

[24]    The court notes that the Tondel case is discussed under the heading of "Hematological Effects" in the **United States Department of Health, Agency for Toxic Substances and Disease Registry, 2005** *Toxicological Profile for Benzene,* which Plaintiffs cite in their opposition memorandum. (*See* Plaintiffs' original opposition memorandum at p. 25 & ATSDR 2005 Profile, attached as Plaintiffs' Ex. AA at p. 137). However, the Profile contains the following Disclaimer:

        This information is distributed solely for the purpose

The court concludes that this one case report, in the absence of epidemiological studies confirming a causal connection between benzene exposure and MMM, is not a reliable source of scientific evidence upon which causal attribution can be based.

**4.   Zoloth, S.R., et al, _Patterns of Mortality Among Commercial Pressmen_, JNCL, Vol, 76, No. 6, 1047-51 (June 1986)**

Plaintiffs submit that this study:

> is a cohort study of the mortality in 1,401 men who worked with printing machines.  The authors reported that "Commercial pressmen may work with benzidine-based color inks...."  And significantly, they found an increase in "all lymphatic and hematopoietic system cancers...," including "three deaths due to myelofibrosis ... [classified as a cancer in ICD], a relatively rare myeloproliferative disease (crude incidence 2/100,000) **that is known to be associated with benzene exposure."**

_____

of pre dissemination public comment under applicable information quality guidelines.  It has not been formally disseminated by the Agency for Toxic Substances and Disease Registry.  It does not represent and should not be construed to represent any agency determination or policy.

(_See_ ATSDR 2005 Profile, attached as Plaintiffs' Ex. AA. at p. ii).

Further, notwithstanding this Disclaimer, the Profile states that "[e]pidemiological studies and case reports provide clear evidence of a causal relationship between occupational exposure to benzene and benzene-containing solvents and the occurrence of acute myelogenous leukemia (AML)."  (p. 12). **Again, Malcolm LeBlanc was diagnosed with MMM, <u>not</u> acute myelogenous leukemia.**

*See* Plaintiffs' Orig. Opp. Memo. at pp. 19-20, noting the Zoloth study at p. 1049, citing medical textbooks, emphasis added by Plaintiffs; *see also* p. 1 of Dr. Gardner's Supplemental Report, and p. 2 of References for statistical analysis for the Zoloth study.

However, the Zoloth study does not state that the workers were exposed to solvents containing only benzene.  The authors state:

> Benzene may not be the only solvent in the industry capable of causing hematopoietic system cancers.  Checkoway et al. suggested that carbon tetrachloride and carbon disulfide exposure is associated with leukemia.  Both of these are used extensively in the printing industry.

Zoloth study at p. 1049.

The court concludes that because the authors did not distinguish between exposure to these various chemicals, no conclusion can be drawn attributing causation to benzene alone. Thus, the Zoloth study does not constitute reliable scientific evidence supporting a causal relationship between MMM and benzene exposure.

**5.   Arnetz, B. et al, *Mortality Among Petrochemical Science and Engineering Employees*, ARCH. ENVIRO. HEALTH, 46:237-48 (1991)**

Plaintiffs submit that this study:

> is a cohort study of 13,250 Exxon employees

> who worked in New Jersey from 1964 to 1986.
> The study found two cases of myelofibrosis ...
> The employees were broken down into groups,
> depending on the amount of time "a person was
> potentially exposed to chemical and physical
> agents (e.g. organic and halogenated solvents
> [benzene] and radiation.)" Although the study
> did not quantify the workers' levels of
> exposure, the authors concluded that further
> investigation was warranted including
> examination of benzene exposures.

*See* Plaintiffs' Orig. Opp. Memo. at pp. 19-20, noting the Arnetz

study at pp. 238, 245-46; *see also* p. 1 of Dr. Gardner's

Supplemental Report, and p. 2 of Dr. Gardner's Supplemental Report,

"References" setting forth statistical analysis for the Arnetz

study.

The Arnetz study involved commercial and development

personnel.  In discussing their study, the authors stated in part:

> We found a significant elevation in age-
> adjusted leukemia and lymphatic cancer
> mortality rates among white males in job
> exposure class 3 (e.g., scientists and
> engineers) compared with job exposure class 4
> (e.g., managers and support staff).  When we
> applied the Poison regression model and
> adjusted for multiple factors, we found a
> statistically nonsignificant elevation among
> job exposure classes 1 (e.g., research
> technicians) and 3 (e.g., scientists and
> engineers).  Even though this is statistically
> nonsignificant, the increased risk factor may
> have biological implications that require
> further assessments.  **Environmental factors
> that require further assessment include
> benzene, other aromatics, radiation, medical
> treatment, and smoking.**  This increase was
> present when a follow-up latency of 10 y or

less was used...

Scientists, engineers, and research technicians may handle hundreds of chemicals during a career. **It was not possible, using the present design system, to pinpoint any specific cause for the increased risk of leukemia and lymphatic cancer mortality.** The current published literature indicates that exposure to benzene, other aromatics and radiation; medical treatment; and smoking habits are factors that require further investigation. Because our study focused on mortality, we could not provide information on leukemia and lymphatic cancer incidence...

This study was designed to be a surveillance project. **We cannot pinpoint any specific cause for the results. Further research is needed to assess if specific environmental factors, e.g., benzene, other aromatics, radiation, medical treatment, and smoking, might have contributed to the finding of increased mortality among scientists, engineers, and research technicians from leukemia and lymphatic cancer.**

(*See* Arnetz study at pp. 245-47, emphasis added by court).

The court concludes that this study does not constitute reliable scientific evidence supporting a causal relationship between MMM and benzene exposure.

34

**OTHER "REFERENCES" LISTED BY DR. GARDNER AND ATTACHED AS PLAINTIFFS' EXHIBITS[25] DO NOT SUPPORT THE CONCLUSION THAT BENZENE IS A GENERAL CAUSE OF MYELOFIBROSIS:**

### (1)  Kawai (Plaintiffs' Ex. II)

This study examined the extent of occupational exposure of tank drivers to benzene and other aromatic solvents.  It has nothing to do with myelofibrosis or its cause.   Thus, the court concludes that this reference is not relevant to Malcolm LeBlanc's claim and it is unreliable as support for the conclusion that the benzene exposures Plaintiffs allege caused Malcolm LeBlanc's myelofibrosis would cause the same particular disease in the general population in similar circumstances. *Knight*, 482 F.3d at 353.

### (1A) Health Watch Study (Plaintiffs' Ex. JJ)

This was a study "carried out in response to results obtained in the Australian Institute of Petroleum Health Watch study indicating an excess of lympho-haematopoietic cancer (LH cancer) apparently associated with exposure to benzene." (Ex. JJ at p. xiii).

---

[25]    To the extent that Dr. Gardner lists other references that are <u>not</u> attached as Plaintiffs' Exhibits, the court finds that Plaintiffs cannot rely on such references in opposition to the instant motions.  Plaintiffs do not attach as Exhibits Dr. Gardner's References, Nos. 3 through 10G.

> A total of 79 cases of LH cancer, satisfying the study criteria, were identified in the cohort of nearly 16 thousand male workers and retirees.  These included 33 leukaemeias, 31 non-Hodgkins lymphomas (NHL) and 15 multiple myelomas (MM).  The study was of the "case-control" design in which the benzene exposures of the cases and controls were compared and analyzed...
>
> The results demonstrate a strong association between past benzene exposure and leukaemia as a whole and the subtypes, acute myeloid leukaemeia (AML) and chronic lymphocytic leukaemeia (CLL).  No significant association was found between benzene exposure and lymphatic cancer (non-Hodgkin's lymphoma and multiple myeloma) or multiple myeloma alone.

*Id.*

The study did not address myelofibrosis or its cause.  Thus, the court concludes that this reference is not relevant to Malcolm LeBlanc's claim and it is unreliable as support for the conclusion that the benzene exposures Plaintiffs allege caused Malcolm LeBlanc's MMM would cause the same particular disease in the general population in similar circumstances.  *Knight*, 482 F.3d at 353.

## (2)  Guenel  (Plaintiffs' Ex. KK)

In this case-control study, the authors fund an increased risk of leukemia in gas and electrical workers exposed to benzene > 16.8 ppm-years.  (Ex. KK, p. 87).  The link with benzene was more pronounced for acute leukemia than for chronic lymphocytic

leukemia, but no association with a particular leukemia cell type was apparent. (*Id.*).    However, there is no discussion of myelofibrosis or a link between benzene and myelofibrosis.

Thus, the court concludes that this study is not relevant to Malcolm LeBlanc's claim and it is unreliable as support for the conclusion that the benzene exposures Plaintiffs allege caused Malcolm LeBlanc's MMM would cause the same particular disease in the general population in similar circumstances. *Knight*, 482 F.3d at 353.

**STUDIES AND REPORTS LISTED IN APPENDIX IV-A OF DR. GARDNER'S REPORT AND ATTACHED AS PLAINTIFF'S EXHIBITS DO NOT SUPPORT THE CONCLUSION THAT BENZENE IS A GENERAL CAUSE OF MYELOFIBROSIS:**

**(1)  Rushton study** (discussed above)

**(2)  Kaplan study** (discussed above)

**(3)  Leigh, T., et al, 1959, *Myelofibrosis: The General and Radiologic Findings in 25 Proved Cases.* AM JR OF ROENTGENOLOGY, RADIUM THERAPY AND NUCLEAR MEDICINE, Vol**

**82, 2:183-193  (Plaintiffs' Ex. U)**

In this report, the authors reviewed 25 cases of myelofibrosis seen from 1948 to 1958.  The authors state in part:

> The etiology of myelofibrosis in the majority of cases in unknown.  According to previous reports 5 to 100 per cent have a history of exposure to benzene (benzol), or other known marrow toxins.

Leigh Report at p. 183.

In the Leigh study, "[f]ive cases had a history of exposure, or possible exposure, to potential marrow toxins." *Id.* at p. 186. However, there is no reference or documentation in this report that any of these five persons were exposed to benzene.

Thus, the court concludes that this study is not relevant to Malcolm LeBlanc's claim and it is unreliable as support for the conclusion that the benzene Plaintiffs allege caused Malcolm LeBlanc's MMM would cause the same particular disease in the general population in similar circumstances. *Knight*, 482 F.3d at 353.

**(4) Wyatt, J., et al, 1950 *Chronic Marrow Failure, Myelosclerosis and Extramedullary Hematopoiesis*, BLOOD, Vol. 4, 329-47 (Plaintiff's Ex. T)**

In this report,

> Thirty cases, including 20 autopsied, of chronic bone marrow failure, myelosclerosis

38

> and osteosclerosis have been presented and
> compared with similar reports in the
> literature...Etiologic factors implicated
> included exogenous toxic chemicals, liver
> dysfunction, endocrine abnormalities, blood
> loss or destruction and cardiovascular
> disease.

Wyatt study at p. 343.  Four of the thirty cases "had histories of

rather severe and usually prolonged exposure to benzol."  *Id.* at

337.

> The first 2 patients were daughter and father.
> The latter, an enthusiastic amateur painter,
> used about five gallons of 60 per cent benzol
> paint remover yearly in his home for over six
> years, and his daughter was exposed to the
> fumes for eleven months.  Both cases had
> recognized medicolegal status as benzol
> poisoning.  Case 3 had been exposed to
> gasoline fumes for twenty-six years and paint
> remover fumes for nine additional years.  He
> showed leukemic infiltrations at autopsy,
> restricted to the liver and possibly arising
> there.  Case 4 employed benzol paint remover
> for over seven years.  Both experimentally and
> clinically, benzene is known to produce
> necrosis of all cell types of hematopoietic
> cells, as well as neoplastic-like or leukemic
> changes.

*Id.* at 349-40 (notations omitted).

However, there is no specific mention of myelofibrosis in this

study, and there was no quantification of benzene exposure.

Thus, the court concludes that this study is not very relevant to

Malcolm LeBlanc's claim and it is unreliable as support for the

conclusion that the benzene Plaintiffs allege caused Malcolm

39

LeBlanc's MMM would cause the same particular disease in the general population in similar circumstances. *Knight*, 482 F.3d at 353.

**(5)  Rawson, R., et al, 1941 *Industrial Solvents as Possible Etiologic Agents in Myeloid Metaplasis*, SCIENCE, Vol. 93:541-42 (1941) (Plaintiffs' Ex. S)**

The totality of this article states:

> There has recently been described under the name of agnogenic myeloid metaplasia a syndrome which both from a clinical and hematologic point of view has been frequently confused with myelogenous leukemia, hemolytic jaundice or anemia.

> The term agnogenic implies that the etiology of the condition was then unknown. A comparison of the histologic findings in this condition with those found in chronic benzol poisoning together with certain clinical evidence led to an investigation of the occupational histories of the patients now in our clinic with myeloid metaplasia.

> All the 6 available for study gave a history of exposure to ceratin industrial solvents including benzol and carbon tetrachloride. Case 1 worked for 5 years with benzol in a shoe factory.  Case 2 cleaned mesh machines with benzol for half an hour a week for 16 years.  Case 3 washed bearings in "high test gasoline" for 20 minutes 4 times a day for 26 years.  Case 4 was exposed to the fumes of carbon tetrachloride for an hour each day for 8 years.  Case 5 used large amounts of paint remover for 1 ½ hours a day for 15 years. Case 6 was exposed to a paint remover containing benzol intermittently for a period of many years.

> These facts suggest that exposure in some
> individuals to certain fat solvents may result
> in the clinical picture previously described
> as agnogenic myeloid metaplasia.  It is quite
> likely that some patients with this syndrome
> will give no history of such an exposure, and
> it is reasonably certain that many so exposed
> will escape unscathed.
>
> **Further work on this subject is being carried
> out**.

*Id.* (emphasis added).

The court concludes that this article is of marginal relevancy and it is unreliable as support for the conclusion that the benzene Plaintiffs allege caused Malcolm LeBlanc's MMM would cause the same particular disease in the general population in similar circumstances.  *Knight*, 482 F.3d at 353.

### 6. Honda, Y. et al, *An Updated Study of Mortality Among Workers at a Petroleum Manufacturing Plant*, JOEM, Vol. 37.2:194-200 (1995) (Plaintiffs' Ex. I)

This study evaluated mortality among 9796 white male workers at a petroleum-manufacturing plant in the 1980's.  The authors stated in part:

> The main purpose was to examine recent
> patterns in leukemia mortality, for which an
> increase had been reported in an earlier
> investigation.  Compared to U.S. white men,
> the cohort had an excess of leukemia in 1940-
> 1979 (38 observed/23 expected; standardized
> mortality ratio = 168; 95 % confidence
> interval = 119-120).  In the 1980's, there was

a deficit of leukemia (8 observed/14 expected;
standardized mortality ratio = 55; 95 %
confidence interval = 24-108).  However, this
was balanced by an excess of myelofibrosis and
myelodysplasia (4 observed, < 1 expected).

. . .

The present study confirms an earlier report,
which suggested that the employees have a high
rate of MF/MDS [myelofibrosis/myelodysplastic
syndrome].  The increase appears
to be related to the same time period of
employment as the leukemia excess, but the
reason for the excess is unknown.  MF/MDSs
share come clinical and pathological features
with certain types of leukemia, and some cases
of MF/MDS have been reported to coexist with
or progress into leukemia.  Thus, MF/MDS and
leukemia may be part of a singe disease
process.  In addition, there may have been a
local shift in diagnosis or reporting
practices in the 1980s, with some persons
designated as having MF/MDS, who, if diagnosed
in earlier time period, would have been
designated as having leukemia.  This
interpretation is supported by the fact that
in the 1980s, the excess of MF/MDS (4
observed/0 expected) was closely balanced by
the deficit of leukemia (8 observed/ 14
expected) during the same decade.  That is, if
leukemia and MF/MDS are considered as a single
disease category, the combined observed number
of deaths is approximately equal to the
expected number.  Another follow-up study of
workers from various petroleum refineries [the
Kaplan study] reported 3 observed compared to
1.5 expected MF deaths in the time period
before 1981.  Other investigations of
petroleum industry workers have not reported
results separately for MF or MDS.

(Honda study at pp. 194, 199-200).

The court finds that this report is unreliable because there

is no specific link to benzene.  Further, myelofibrosis was clustered together with myelodysplasia, and MMM was not studied as a separate disease.

**(7)  Zoloth Study (discussed above)**

**STUDIES AND REPORTS LISTED IN APPENDIX IV-B OF DR. GARDNER'S REPORT AND ATTACHED AS PLAINTIFF'S EXHIBITS DO NOT SUPPORT THE CONCLUSION THAT BENZENE IS A GENERAL CAUSE OF MYELOFIBROSIS:**

**1. Antonucci, R., et al 1989 *Myelofibrosis and Aplastic Anemia: First Report of the Two Disorders Occurring Sequentially in the Same Person,* AM JR MED., Vol. 86, 253-55. (Plaintiffs' Ex. Z)**

This is a case report of a patient "who, 20 years after the occurrence of severe aplastic anemia presumed secondary to benzene exposure, developed myelofibrosis..."  Patient had cleaned furniture on many occasions with a product containing a high percentage of benzol.  The court finds that this case report is unreliable because there was no quantification regarding the level of benzene exposure sustained by this one patient.

43

**2.   Askoy, M., et al 1975 *Two Rare Complications of Chronic Benzene Poisoning: Myeloid Metaplasia and Paroxysmal Nocturnal Hemoglobinuria,* BLUT, 30:255-60  (Plaintiffs' Ex. W)**

Case study of 2 patients: one with myeloid metaplasia and one with Paroxysmal Nocturnal Hemoglobinuria.  Case 1 (patient was a shoeworker) links myeloid metaplasia with benzene as the main causal factor, although authors could not exclude the possibility of some other agents.  The court finds that this study is unreliable because no exposure studies were performed, and the patients in the study did not have MMM.

**3.   Port, M., et al, 1965, *Myeloid Metaplasia as a Result of Chronic Benzene Intoxication*, NY STATE JR OF MED, Vol, 65, 17:2260-62. (Plaintiffs' Ex. V)**

This is a case report of a patient who was a hand presser in dry cleaning factories and had been subjected to chronic inhalation of cleaning fluids containing benzene (benzol) for 30 years.  The patient developed myeloid metaplasia, and the author thought that the presentation of the case was of interest because it re-emphasized the potential danger of the inhalation of a toxin which may produce hypoplasia or aplasia.  The author also stated:

44

> of importance is the relationship between the development of myeloid metaplasia and chronic benzol intoxication. Myeloid metaplasia occurs frequently in association with longstanding polycythemia vera. It is classified as one of the group of myeloproliferative disorders.

The court finds that this study is unreliable because no exposure studies were performed, and the patient in the study developed myeloid metaplasia, while Malcolm LeBlanc's diagnosis is MMM.

### 4.   Bosch, X., 1989 *Toluene-Associated Myelofibrosis,* BLUT, 58:219-20  (Plaintiffs' Ex. Y)

This is a case study of a patient with myelofibrosis who had been working in direct contact with toluene for 40 years.  However, gas chromatography of the product showed no benzene.  Thus, the court concludes that this case study is not relevant to Malcolm LeBlanc's claim and it is unreliable as support for the conclusion that the benzene Plaintiffs allege caused Malcolm LeBlanc's MMM would cause the same particular disease in the general population in similar circumstances.  *Knight*, 482 F.3d at 353.

### 5.   Marsh, G., et al, *Mortality Patterns Among Petroleum Refinery and Chemical Plant Workers,* AM JR OF INDUS MED 19:29-42 (1991)(Plaintiffs' Ex. M)

45

This was a historical cohort study conducted to evaluate the mortality experience of 6,831 employees of the Shell Oil Company, Deer Park, Texas, petroleum refinery and chemical plant with emphasis on cancer mortality. Patterns of increased risk were observed among chemical plant workers for a category of lymphopoietic tissue cancers, including multiple myeloma, myelofibrosis, polycythemia vera, and certain non-Hodgkin's lymphomas. MMM was not studied as a separate disease. Further, **"a lack of detailed data on specific chemical exposures precluded accurate assessments of exposure-response."** (*Id*. at p. 29, emphasis added).

Thus, the court concludes that this study is not very relevant to Malcolm LeBlanc's claim and it is unreliable as support for the conclusion that the benzene exposures Plaintiffs allege caused Malcolm LeBlanc's MMM would cause the same particular disease in the general population in similar circumstances. *Knight*, 482 F.3d at 353.

**6.   Tondel study (discussed above)**

**7.   Hu, H., 1987 *Benzene-Associated Myelofibrosis*, ANNALS OF INT MED, Vol. 106. 1:171-72 (Plaintiffs'**

46

**Ex. X)**

This is a case study of a woman who ran a cementing machine that glued felt inside handbags.  She frequently used benzene as a solvent to wipe off excess glue and to clean the machine.  She developed myelofibrosis with myeloid metaplasia.  Author stated "Myeloid metaplasia as a complication of chronic benzene poisoning in humans has been reported since the chemical's introduction in the shoe and leather industries in the 1930's and hematology textbooks." (*Id*. at p. 172).  The court finds that this one case is unreliable because there were no quantification of the benzene exposure the patient may have sustained.

**8.   Gall, E.A., 1983 *Benzene Poisoning with Bizarre Extra-Medullary Hematapoiesis*, ARCHIVES OF PATHOLOGY, 23:315-26 (1938) (Plaintiffs' Ex. R)**

This is case study reviewing the clinical history and histologic observations of a 45 year old leather worker who was exposed to benzene, ethyl acetate and butanol for about 4 years.  The author states: "The patient had had prolonged contact with benzene vapor and had as a development therefrom profound anemia, graulopenia and thrombocytopenia." (p. 318).  A bone marrow biopsy showed extensive fibrous replacement. (*Id*.).  The court finds that

this one case is unreliable because there were no benzene exposure measurements and the relevance is questionable because the clinical picture was aplastic anemia.  (p. 326).

**12.[26]      Bond, G., et al.  *An Update of Mortality Among Chemical Workers Exposed to Benzene*, BR JR OF INDUS MED 43:685-91 (1986)  (Plaintiffs' Ex. L)**

This was a mortality study updated to the end of 1982 for 594 employees exposed to benzene who had been previously studied and for an additional 362 exposed workers not previously studied.  A non-significant excess of total deaths from leukaemeia was noted based on four observed cases; however, all four were myelogenous leukaemeias and this represented a significant excess in that category.  The authors concluded that:

> **Analyses by work area, duration of exposure, and cumulative dose index did not show patterns suggestive of a causal association between exposure to benzene and any particular cause of death.**  Three of the four patients with leukaemia, one with multiple myeloma, and one with myelofibrosis worked in alkyl []. [27] This may indicate that some **additional co-**

---

[26]     The numbering system on Dr. Gardner's Appendix IV-B jumps from No. 8 to No. 12 (with Nos. 9-11 missing).

[27]     The copy of this article provided to the court by Plaintiffs as Plaintiffs' Ex. L is illegible at this point.

> **factors may be important in the aetiology of these deaths.  Other materials present in this work area included ethylbenzene, divinylbenzene, toluene, []**[28]**, isopropyl benzene, styrene, diisopropyl benzene, and alpha-methyl styrene.**
>
> . . .
>
> Although this study provides support for the association between exposure to benzene and acute myelogenous leukaemeia reported by others ..., several factors complicate use of these data for risk assessment.  These include the problem of a small number of events, competing exposures to other potentially hazardous materials, and the uncertain contribution of unquantified brief exposures.

*Id*. at 691.

The court concludes that this study is unreliable as support for the conclusion that the benzene exposures Plaintiffs allege Malcolm LeBlanc had would cause MMM in the general population in similar circumstances.  *Knight*, 482 F.3d at 353.  Further, because acute myelogenous leukemia and MMM (myelofibrosis with myeloid metaplasia) are two different diseases, any reliance on scientific evidence regarding a causal link between benzene exposure and acute myelogenous leukemia is misplaced because Malcolm LeBlanc was diagnosed with MMM (myelofibrosis with myeloid metaplasia), and not acute myelogenous leukemia.

---

[28]     *Id.*

49

### III.   Conclusion

Having reviewed the various reference materials cited by Dr. Gardner and attached as Exhibits to Plaintiffs' briefs, the court concludes that Dr. Gardner's reference materials insufficiently not meet the Hill causation criteria and there is insufficient valid and admissible scientific evidence (under *Daubert* and Federal Rule of Evidence 702) to support Dr. Gardner's opinion that benzene and the type of benzene exposures Malcolm Leblanc experienced exposure are capable of causing MMM in the general population.   Some of Dr. Gardner's references do not address myelofibrosis (or myelofibrosis with myeloid metaplasia); some have nothing to do with causation; in others, no conclusion could be drawn regarding causation; and the findings of one study (the 1983 Rushton/Alderson study) were not confirmed by follow-up studies (Rushton and Sorahan studies) on the same cohort.   Other than the 1983 Rushton/Alderson study (the findings of which were not duplicated), no peer-reviewed scientifically accepted literature that attributes myelofibrosis or MMM to benzene exposure was identified.[29]

---

[29]     While Malcolm LeBlanc's treating hematologist/oncologist, Dr. Chris Theodossiou, has not been offered as a causation expert in this matter, he has been deposed in this matter and the court notes with interest the following excerpt from Dr. Theodossiou's testimony:

Q.   Throughout your training and throughout your practice, have you had an opportunity to review scientifically peer reviewed literature?

A.   Yes.

Further, cohort studies cited by Dr. Gardner (including the Rushton study, the Kaplan study, the Zoloth study, and the Arnetz study) observed an increased incidence of myelofibrosis, but they did not include benzene exposure estimates, separate and distinct from exposure to other substances in the same setting. The individual case reports referenced by Dr. Gardner do not show statistical significance in the incidence of myelofibrosis or MMM in persons exposed to benzene, but rather they only show a possible adverse effect of benzene and/or some other toxin. The court concludes that the individual case reports, while interesting, do not constitute reliable scientific evidence in this case to support general causation.

In short, Dr. Gardner's general causation testimony must be excluded because "the analytical gap between the studies on which he relied and his conclusions [is] simply too great and his

---

Q.   Are you aware of any peer reviewed, scientifically accepted evidence that benzene exposure causes myelofibrosis?

A.   You will find very few anecdotal reports. But, again, association does not necessarily mean causation.

Q.   But, again, nothing in the nature of a large-scale epidemiological study?

A.   No.  There is none.  You will find anecdotal reports, or you will find a series of two or three patients lumped together. But you're not going to find a series of ... dozens of patients.

(*See* pp. 49-50 of Dr. Theodossiou's Deposition, Ex. 3 to Defendants' Response to Plaintiffs' Sur-reply).

opinions [are] thus unreliable." *Kirby*, 482 F.2d at 355.[30]

Accordingly;

**IT IS ORDERED** that Defendants' **"Motion in Limine to Exclude Reports and Testimony of Dr. Frank Gardner, and Motion for Summary Judgment" (Doc. No. 99)** be and are hereby **GRANTED**, dismissing all of Plaintiffs' claims against Defendants.

New Orleans, Louisiana, this **18th** day of **June, 2007**.

A.J. McNAMARA
UNITED STATES DISTRICT JUDGE

---

[30]   Because the court has concluded that Dr. Gardner's testimony regarding general causation lacks the necessary foundation to withstand *Daubert* scrutiny, the court does not consider whether Dr. Gardner's specific causation testimony (i.e., Malcolm LeBlanc's exposure to benzene actually caused his MMM) is admissible.